People v Hargrove (2018 NY Slip Op 02649)





People v Hargrove


2018 NY Slip Op 02649


Decided on April 18, 2018


Appellate Division, Second Department


Miller, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 18, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
ROBERT J. MILLER
COLLEEN D. DUFFY
HECTOR D. LASALLE, JJ.


2015-04231
 (Index No. 10150/91)

[*1]The People of the State of New York, appellant, 
v
Rosean Hargrove, respondent.



APPEAL by the People, as limited by their brief, from so much of an order of the Supreme Court (ShawnDya L. Simpson, J.), dated April 14, 2014, and entered in Kings County, as, after a hearing, granted that branch of the defendant's motion which was pursuant to CPL 440.10(1)(g) to vacate a judgment of the same court (Gloria Goldstein, J.) rendered December 14, 1992, convicting him of murder in the second degree and assault in the first degree, upon a jury verdict, and imposing sentence, and for a new trial, on the ground of newly discovered evidence.



Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove and Diane R. Eisner of counsel), for appellant.
Edelstein & Grossman, New York, NY (Jonathan I. Edelstein, Pierre Sussman, and Robert M. Grossman of counsel), for respondent.



MILLER, J.


OPINION & ORDER
The defendant in this case has remained behind bars for more than two decades for a crime that he has consistently maintained he did not commit. The Supreme Court, on the basis of newly discovered evidence, vacated the defendant's judgment of conviction and ordered a new trial.
The People have appealed from the Supreme Court's order. While the issues implicated by this case represent some of the most pressing and contentious matters facing the criminal justice system today, the People have chosen to focus their appeal on an array of procedural and evidentiary arguments, largely ignoring the major underlying issues at stake.
But these rules of procedure and evidence are not to be invoked for their own sake. They do not exist solely as an arsenal to be ranged against the accused or the imprisoned. They exist so that truth may emerge from their considered application. Indeed, it requires no earth-shattering pronouncement to state simply what centuries of jurisprudence make clear: that justice is the whole of the law.
And although our institutions of law enforcement are the bedrock of our system of justice, they do not deserve our blind faith or allegiance. When we succumb to that temptation we abdicate our duty to ensure that justice is done in every case and under every circumstance. Society's allegiance and faith must be earned through our labors and consistently reaffirmed by our decisions. Recognition of our errors does not make our system weak, it makes it resilient. When we ignore our errors or seek to avoid confronting them, we imperil the very foundations of our legitimacy.
In this case, the Supreme Court determined that evidence of prior police misconduct, if known to the court and the jury, would have created a probability of a more favorable verdict to the defendant. As such, the trial court acted appropriately when it vacated the conviction and ordered a new trial. For the gravest manner of injustice that we know is the imprisonment of a fellow human being for a crime that he or she did not commit.
Through it all, we cannot say whether the defendant is guilty or whether justice has ultimately been done in this case. But that is precisely why the defendant is entitled to a new trial. Accordingly, we affirm the order insofar as appealed from.
Factual and Procedural Background
1. Events Leading to the Defendant's Arrest
In the early morning hours of August 13, 1991, Rolando Neischer and Robert Crosson sat in a car in front of the Kingsborough housing projects in Brooklyn, New York. The two men both lived in the housing project and had known each other for their entire lives. They both worked as correction officers at Rikers Island.
Neischer and Crosson sat in the car and talked for about an hour. Neischer sat in the driver's seat and Crosson was seated next to him in the front passenger seat. The windows of the car were open.
Sometime around 4:00 a.m., while Neischer and Crosson were sitting and talking, two people approached the car on bicycles. One of the individuals was on the driver's side of the car and the other was on the passenger's side. As soon as the individuals came up to the car they displayed guns and told Neischer and Crosson to "get the fuck out the car."
Neischer opened the driver's side door of the car and as soon as he got out, Crosson saw the individual on the driver's side fire a gun. While the shots were being fired, the individual on the passenger side told Crosson to "get the fuck out of the car." The individual on the passenger side pointed a gun in the car and Crosson "put [his] hands up to [his] face because the gun was pointed right at [his] face." Then the gun "went off" and Crosson was hit in the hand.
Crosson thought he had been shot in the head because blood was rushing down his head. He got out of the car and kneeled down beside it. He put both of his hands over his head and assumed a somewhat crouched position. He later testified that he looked up at one of the perpetrators. When the two perpetrators got into the car, Crosson ran towards the housing project. After the car drove off, Crosson ran back to the street and looked for Neischer, but he "didn't see him." Crosson then ran to get help.
Crosson came upon a police car as soon as he went around the corner. Crosson ran to the police car and identified himself as a correction officer. Crosson returned to the scene of the crime with the police officers. They found Neischer on the ground "[a]bout a half-block" down the street, reloading the .38 caliber handgun that he had been carrying with him that night. Six .38 caliber spent shell casings were recovered at the scene.
Neischer was transported from the scene in an ambulance. Crosson accompanied him. Neischer, who sustained a total of five gunshot wounds, later died as a result of those injuries. Crosson was treated for a gunshot wound to his hand.
Police officers responding to the scene observed two bicycles lying on the ground on opposite sides of the street at the location of the shooting. Fingerprint evidence was recovered from [*2]at least one of the bicycles. Blood samples were also recovered from the bicycles. The blood evidence was submitted to the police laboratory later on the date of the shooting for a comparison with Neischer's blood.
Less than 24 hours after the shooting, an unidentified individual at the police precinct received a telephone call from an anonymous caller. After learning of the telephone call, Louis Scarcella, then a detective with the New York City Police Department, responded to 230 Lott Avenue in Brooklyn with his partner, Detective Steven Chmil, and another detective named John Barba. The detectives proceeded to the second floor of the building where they arrested the defendant in the hallway.
After the defendant was handcuffed, the defendant was informed that he was being charged with attempted murder. The defendant was 17 years old at the time.
The defendant was subsequently taken to the police precinct where he was placed in a lineup. Crosson viewed the lineup and identified the defendant as one of the perpetrators. Crosson had previously selected the defendant's photograph from a group of photographs that were shown to him by Detective Chmil.
Police recovered Neischer's vehicle at a location in Brooklyn the day after the shooting on August 14, 1991. The car had a flat tire and there was blood on the driver's side door frame. A bullet was recovered from the tire. Blood was also observed inside the car on the seats. Fingerprints and palm prints were lifted by police investigators from the stolen vehicle. The "numerous blood samples" recovered from the vehicle were sent to "be processed further at the lab."
2. The Pretrial Hearing
The defendant and a 14 year old named John Bunn (hereinafter the codefendant) were charged with two counts of murder in the second degree, attempted murder in the second degree, robbery in the first degree, two counts of assault in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.
The defendant and the codefendant moved to suppress Crosson's identification and were granted a hearing pursuant to United States v Wade (388 US 218) and Payton v New York (445 US 573). The suppression hearing took place on September 9, 1992, before the Honorable Gloria Goldstein, a Justice of the Supreme Court, Kings County.[FN1]
Prior to the hearing, the prosecutor noted that there were "a lot of latent palm prints" that were recovered from the stolen vehicle. He requested that the defendant and the codefendant submit their palm prints for comparison. The defendant voluntarily agreed to provide "whatever" prints the prosecutor requested. The codefendant also agreed to submit his palm prints, and additionally volunteered to undergo "a polygraph."
The People presented the testimony of Detectives Barba, Chmil, and Scarcella in order to sustain their burden of demonstrating that the police did not use any impermissible procedures in conducting the pretrial identifications, that the series of photographs and the composition of the lineups were not unduly suggestive, and that the defendant's arrest did not violate Payton.
Detective Chmil testified that Detective Barba and his partner, Detective Scarcella, were "the assigned detective[s]" in charge of investigating the shooting. Detective Chmil testified that Crosson went to the police precinct to look at photographs on August 13, 1991—the same day as the shooting. Detective Chmil put together a series of six photographs to show Crosson. When he was asked how he chose the photographs that he showed to Crosson, Detective Chmil testified: "I just opened the drawer which contained about 5, 6 hundred color photographs and just randomly [*3]picked out 6 photos." Detective Chmil further testified that he intentionally put the defendant's photograph in the middle.
Detective Chmil testified that he spoke to Crosson before he assembled the photographs, but that Crosson was not present when the six photographs were selected. Detective Scarcella was present with Detective Chmil in the detective squad office when the photographic array was shown to Crosson. No other police officers were present at that time.
Detective Chmil handed Crosson the six color photographs in "looseleaf" form, and asked Crosson if he recognized anyone. Crosson picked out the photograph of the defendant and said that he was " 90 percent sure'" that he was one of the perpetrators.
Detective Scarcella testified that at about 12:30 a.m. on August 14, 1991, he responded to 230 Lott Avenue in Brooklyn with his partner, Detective Chmil, and Detective Barba. The detectives responded to that address after an unidentified individual at the police precinct "received a phone call" from an anonymous caller.
Detective Scarcella testified at the hearing that they proceeded to the second floor of the building although the anonymous caller had not specified the apartment in which the defendant lived. When the detectives got out of the elevator, they observed the defendant coming out of apartment 2C. The defendant was arrested in the hallway. Detective Scarcella gave the defendant his Miranda warnings in the bedroom of the apartment (see Miranda v Arizona, 384 US 436).
When asked on cross-examination why they responded to the second floor of the three-floor building, Detective Scarcella testified, "We got lucky." When asked again, "You just picked the second floor?", he replied, "We were in the process of trying to ascertain if there was a janitor or some type of caretaker or custodian."
Detective Barba testified that a lineup identification was conducted on August 14, 1991. Crosson arrived at the police precinct sometime before the lineup was conducted. Detective Barba did not know what time Crosson arrived. Detective Barba testified that Crosson was "[w]ith other detectives" while he was waiting at the police precinct.
Detective Barba testified that Crosson viewed the lineup at about 11:40 a.m. The lineup was "supervised by Lieutenant Tartaglia . . . Detective Scarcella, [and] Detective Chmil." The lineup consisted of six individuals. Crosson identified the defendant, stating: "Number 5, he's the man who had the gun. He's the man who shot me. He's a criminal."
At the conclusion of the People's presentation, defense counsel moved, citing People v Chipp (75 NY2d 327), for an independent source hearing. The Supreme Court summarily denied defense counsel's motion before the People took a position.
In a written order dated September 21, 1992, the Supreme Court (Gloria Goldstein, J.) denied the defendant's motion to suppress Crosson's identification of the defendant. The court credited the police officers' testimony and concluded that there were "no improprieties whatsoever."
3. The Trial
The defendant and the codefendant were jointly prosecuted at a single trial. The initial jury instructions, the prosecutor's opening statement, the People's case, and the defense cases were all presented over the course of a single day.
In his opening statement to the jury, the prosecutor stated that "this case will not be a long one" since there was only "one eye witness." The prosecutor also stated that "[t]he police in this case had very little to do with it . . . other than conducting a line-up."
At trial, the People presented Crosson's testimony in order to establish the identities of the shooters.
Crosson made an in-court identification of the defendant as the individual who shot him. Crosson also identified the codefendant as the individual who shot Neischer. Crosson testified that he had not been frightened during the incident.
Crosson testified that he went to the police precinct to view two lineups after the shooting. In the first lineup he "picked out Rosean Hargrove"—the defendant. In the second lineup he picked out "John Bunn"—the codefendant.
On cross-examination, Crosson was asked whether he told the first two police officers he approached after the shooting that one perpetrator was a "male black, 16 to 20 years of age." He was also asked whether he told a detective at the hospital that one of the perpetrators was "a male black in his twenties, five foot nine or ten, light skinned." Crosson answered that he "gave a description" which was "written down" but that he did not "remember the exact words" he used to describe the perpetrators.
Defense counsel later asked Crosson whether he told an investigator from the Department of Correction that "the man on the driver's side was a male black in his twenties, slim, light skinned, five foot nine to five foot ten." Crosson answered: "I can't remember exactly what words or description that I gave but, if you have it written down in one of my statements, of course, I may have stated it."
Crosson was also asked whether he described the man on the passenger side as "a male black about 20, also light skinned." Crosson answered: "If that's what you have written down for my statement, yes, that's what I said."
Crosson testified that he had grown up in the Kingsborough Housing Project. Crosson had lived in two different buildings within the project at some point with his mother and siblings. Crosson indicated that he was "known everywhere [he] walk[ed]" and that he would "become friends with people."
Defense counsel asked Crosson whether he knew the defendant "from the project" prior to identifying him as one of the perpetrators. Crosson denied knowing the defendant: "I did not know him, period, ever in my life." When defense counsel asked whether Crosson knew the defendant's mother, Crosson initially responded "Listen, you asked me ." After the court intervened and directed Crosson to "only answer the question," Crosson testified that he knew the defendant's mother and the defendant's sister.
The People next called Detective Barba to testify on their direct case. He reiterated that Crosson identified the defendant and the codefendant from the lineups that he conducted at the police precinct. Detective Barba also made his own in-court identifications of both the defendant and the codefendant at the trial. He denied advising Crosson which number he should pick in the lineups.
On cross-examination, Detective Barba testified that police found blood on the inside and outside of Neischer's car when it was recovered by police. The car was removed to the 77th Precinct, and fingerprints and palm prints were recovered from the hood of the car. Detective Barba did not know how many prints were lifted from the car because he did not have "the exact information regarding that in front of [him]."
Detective Barba testified that the fingerprints and palm prints that were recovered from Neischer's vehicle were compared to the defendant's and the codefendant's prints and the results were negative, meaning that they "didn't belong to the defendants."
The fingerprints and palm prints also did not belong to Neischer, the owner of the car. Detective Barba testified that the fingerprints and palm prints were not compared to Crosson's prints because he did not make a request for them.
Detective Barba indicated that fingerprints were lifted from the two bicycles that were recovered from the scene of the crime. Detective Barba testified that "[t]he fingerprints that were lifted from the bicycles didn't belong to the defendants."
Detective Barba stated that the police also recovered blood from the bicycles. He confirmed that, although a request was submitted for a serology comparison of the blood recovered [*4]from the bicycles, he had not received the results of the examination.
Detective Barba testified that on the night of the shooting, he and other detectives canvassed area hospitals in order to determine if anyone was being treated for gunshot wounds. The search came back negative. When the defendant and the codefendant were brought into custody, they did not have any gunshot wounds.
Finally, Detective Barba testified that a description of the perpetrators was broadcast over the police communications system. The description of one of the perpetrators was "[m]ale black, twenties . . . [l]ight complexion." The other perpetrator was described as "male black, twenties."
At the conclusion of Detective Barba's testimony, the People rested. Defense counsel requested a stipulation from the People regarding the blood samples that were recovered by the police inside the stolen vehicle. Defense counsel stated that he had been "informed previously" that the blood samples did not match Neischer's blood type.
The prosecutor stated that he had no knowledge as to whether blood typing had been conducted. Indeed, he could not say "whether it was even human blood." When the court asked the prosecutor if the blood samples were ever tested, the prosecutor stated that tests "might have been requested" but he did not have "any results, nor did the detective, nor does the file."
The court indicated that the defense was entitled to be told about any scientific tests that were done prior to trial. The court and defense counsel continued to ask the prosecutor whether any tests were carried out and the prosecutor continued to say that he did not know if they were or not.
After additional colloquy, the court asked the prosecutor whether he "attempted to get the results." The prosecutor responded: "I have everything that's in the file." The court said "[t]hat's not an answer" and instructed the prosecutor: "The onus is upon you if there is a test to give it to them, and that was long ago and so, yes, make the calls and find out now, by all means if, in fact, there is one, one way or the other."
Defense counsel requested an adverse inference charge in the event that no test results were produced. Defense counsel's application was summarily denied. The defendant and the codefendant rested. The matter was adjourned until the next day.
The next day, before the jury entered the courtroom, the prosecutor stated that he had called a police chemist who looked up the file and told him that "there was material submitted" and that "there were just no tests done or conducted on the blood samples that had been recovered." The prosecutor stated that the blood samples had been "sent from the laboratory [back] to the Property Clerk's office."
After the jury entered, defense counsel gave a closing statement. In his summation, defense counsel argued that the physical evidence was inconsistent with Crosson's account.
Defense counsel also argued that the evidence showed that "the police were looking for a perpetrator who had been shot during this incident . . . they canvassed hospitals in the area [and] they canvassed the dispatch centers of the police department looking for some shooting victims." Counsel continued: "Why would they do that? Because the blood found on the bicycles, the blood found inside the car . . . they didn't believe it was Rolando Neischer's blood. They believed one of these men were hit who fled the area."
Defense counsel stated that "the blood in the car is from whoever it was that killed Rolando Neischer and shot Robert Crosson." He noted that the defendants did not have any marks on them.
Defense counsel asked the jury to "look at the way the police handled this case." He argued that important forensic evidence had not been tested or otherwise investigated. He noted that the fingerprints and palm prints that were recovered from the stolen vehicle did not match the [*5]defendant's prints. He further noted that the prints that were recovered from the bicycles that were used by the perpetrators did not match the defendant's prints. Defense counsel argued that Crosson was "neither credible nor reliable." Defense counsel also argued that Crosson had "lied when he said he doesn't know [the defendant]" since he knew the defendant's mother and sister. Defense counsel contended that Crosson's descriptions of the perpetrators did not "fit these two [defendants] at all," noting that the defendant, who was 17 years old at the time of the arrest, was "obviously not a male in his twenties" and was "certainly . . . not light-skinned, if you look at him."
In his summation, the prosecutor argued that "we know that" the blood in the car came from Neischer. The prosecutor also argued that since the defendants had not been wounded, there was no reason to test the blood in the car because it "couldn't have been their blood." He discounted the fingerprint evidence, telling the jury "you know how unreliable fingerprints are."
The prosecutor asserted that Crosson was face-to-face with the defendant and went to the precinct and identified the defendant after he "look[ed] at all kinds of pictures." The prosecutor also described how Crosson identified the defendant at the lineup.
After summations the court charged the jury. The court charged four counts: (1) murder in the second degree—intentional murder; (2) murder in the second degree—felony murder; (3) attempted murder in the second degree; and (4) assault in the first degree.
After the court gave its instructions, the jury retired to deliberate. At 6:32 p.m. the jury was taken to dinner, after which it resumed deliberations. At 9:00 p.m., the jury requested explanations and clarifications on each of the four counts, which the court provided. The court then instructed the jury to continue its deliberations.
At about 10:32 p.m., the defendant's attorney stated that since it was "Tuesday night prior to Thanksgiving" he was requesting that the jury be instructed that they would not be held over the holiday so that they would not feel "unduly pressure[d]." The application was denied.
At 11:05 p.m. that night, the jury indicated that it had reached a verdict, finding the defendant and the codefendant not guilty of murder in the second degree under count one, and not guilty of attempted murder in the second degree under count four. However, the jury found the defendant and the codefendant guilty of murder in the second degree under count two (felony murder), and assault in the first degree.
4. The Sentence
Prior to sentencing, a presentence investigation report (hereinafter the PSI report) was prepared by the New York City Department of Probation. The PSI report stated that "[s]everal anonymous callers, contacted the police and implicated the defendants." Detectives arranged a photographic array that included the defendant's photograph. The PSI report stated that "Crosson identified [the defendant] as his shooter from the photos but admitted that he recognized him from the projects and would need to see him in person in order to be sure."
The PSI report reflected that the codefendant was incarcerated in a juvenile facility due to his age. The defendant—who was 18 years old at the time—was incarcerated at Riker's Island where he was "in solitary confinement." Both the defendant and the codefendant independently reported that they had been assaulted by correction officers during their confinement.
The defendant and the codefendant were interviewed separately by the Department of Probation. Both repeatedly maintained their innocence. The defendant also stated that "those who told Crosson to blame [him] and [the codefendant], knew about their car theft history." The defendant stated that he had lived in the Kingsborough Housing Project for his entire life, and that Crosson "knows his family" but he was "not sure" if Crosson knew him.
The PSI report included statements made by a correction officer named Alvin Wilson, "a friend and co-worker of the deceased" who had identified Neischer's body at the morgue. Wilson stated that "he got a telephone call soon after the offense from an inmate, who told him that the [*6]defendants were not the murderers." Wilson further stated that he "hope[d] that the defendants [were] the correct murderers."
The PSI report indicated that the defendant had previously been arrested in Brooklyn in connection with "five separate robberies." Those incidents all occurred more than one year prior to the instant offense, and were all "gunpoint robberies of personal property and vehicles . . . committed with accomplices." These robberies occurred in the vicinity of the Kingsborough Housing Project. The PSI report prepared in connection with those charges reflected that the defendant had "admitted his guilt" in committing those crimes.
The defendant and the codefendant were sentenced by the Supreme Court (Gloria Goldstein, J.), on December 14, 1992. The defendant's attorney made an application for an adjournment so that he could make a written CPL 330.30 motion. The defendant's attorney, who was employed by the Legal Aid Society, stated that four witnesses had come forward since the trial and he had not had a chance to speak with three of them since he had "been on trial incessantly since the verdict came in."
Defense counsel stated that he had provided the names of these witnesses to the District Attorney's Office, but he had received word that the District Attorney would not speak to the individuals or otherwise take any action. The court interrupted defense counsel while he was describing the nature of this new evidence, stating that the motion for an adjournment was denied.
The defendant's attorney then requested a two-day adjournment so that he could prepare a "pre-sentence memorandum" which he "didn't have time to prepare." The court denied his request.
The court sought to proceed with the sentencing. The defendant's attorney asked for additional time so that he could finish reading his client's PSI report. The court said it would sentence the codefendant while the defendant's attorney finished reading the defendant's PSI report.
The codefendant was 15 years old at the time of sentencing. The prosecutor asked for the maximum permissible sentence, and requested that the sentences for the two crimes run consecutively. The codefendant's attorney noted that the codefendant was 14 years old at the time of the crime, and asked the court "to be compassionate."
The codefendant was then given an opportunity to address the court. The codefendant stated:
"This Court has convicted me for a crime that I did not commit. I don't know why I am being punished for something I didn't do. I just hope that me, Rosean Hargrove can receive a retrial early. I do feel sympathy for the victim's family, but I did not hurt nor kill anyone."
The court sentenced the codefendant, as an adult, to an indeterminate term of 20 years to life imprisonment on the murder conviction. The court sentenced the codefendant to a concurrent indeterminate term of 2 to 6 years' imprisonment on the assault conviction. The codefendant was later resentenced because his sentence was illegal.
After the codefendant was remanded, the prosecutor addressed the defendant's case, again urging the court to impose the maximum permissible sentences and to run them consecutively. The prosecutor stated that the defendant had "shown a distinct pattern" in that "he has in the past repeatedly been the gunman in armed car hijacks."
Defense counsel proceeded to address the court:
"Your Honor, first of all I would note for the record that I believe, as I stated before, that this verdict is a miscarriage of justice. The wrong people have been convicted of this crime for a number of reasons, and I won't go into all of them. The Court is aware of a number of [*7]reasons why I believe this to be so. It is very difficult for me to approach this, as it was during the trial. You can not be remorseful for that which you did not do. The fact that defendant has been involved in other carjackings has nothing to do with this case."
Defense counsel went on to ask the court for "leniency" given that the defendant was only 17 years old.
The court proceeded to sentence the defendant to an indeterminate term of 25 years to life imprisonment on the murder conviction and an indeterminate term of 5 to 15 years' imprisonment on the assault conviction. The court directed that the sentences run consecutively, and the defendant was remanded into the custody of the Department of Correction.
5. The Direct Appeal
This Court affirmed the defendant's judgment of conviction (see People v Hargrove, 213 AD2d 492).
6. The Defendant's CPL 440.10 Motion
By notice dated March 20, 2014, the defendant moved pursuant to CPL 440.10 to vacate the judgment of conviction and for a new trial.
Defense counsel argued that "[a]t the heart of this motion lies the strong possibility that [the defendant] is actually innocent" and that the sole identification witness comprising the People's case was tainted by the "corrupt investigative practices" of Detective Scarcella and his partner Detective Chmil. Defense counsel argued that the defendant had also discovered that "possible exculpatory evidence was destroyed in bad faith while the prosecution had a duty to preserve it pending [the defendant's] appeal."
a. Corrupt Police Practices
Defense counsel asserted that Detective Scarcella and Detective Chmil had recently come under "intense scrutiny by the media, the courts and the Brooklyn District Attorney's Office due to substantiated allegations of misconduct." Counsel also asserted that the intense scrutiny occurred after it had come to light that Detective Scarcella and Detective Chmil "had engaged in a pattern of illegally suggesting identifications, manufacturing confessions and other accusatory testimony." In support of his assertions, defense counsel attached to his motion several articles from the New York Times reporting on these allegations of misconduct. Also attached were various affidavits submitted in support of motions made in two unrelated criminal matters where prior convictions in which the same two detectives were involved were overturned.
For instance, the 1991 conviction of a man named David Ranta for the murder of Rabbi Haskel Werzberger was based on an investigation by Detective Scarcella and Detective Chmil. However, that conviction was vacated in 2013 after it was determined "that a prosecution witness was coached by [Detectives Scarcella and Chmil] to identify Mr. Ranta as the shooter, other prosecution witnesses recanted their testimony, witnesses were given improper incentives in exchange for their testimony, and . . . police officers perjured themselves at trial and suppressed exculpatory evidence."
It had been discovered that "one of the witnesses who identified Mr. Ranta as the shooter, Menachem Lieberman," had recently come forward to state that "immediately prior [to] entering the lineup room in August 1990, he was told by a detective to pick the guy with the big nose.'" Lieberman's "selection of Mr. Ranta at the lineup and his later identification of him as the shooter of Rabbi Werzberger, was based on this . . . suggestion rather than by any recognition of Mr. Ranta on the day of the crime." The defendant's attorney submitted an affidavit from Lieberman in support of the motion, in which Lieberman detailed how he had been prompted to identify Ranta at the lineup. In another witness affidavit provided to Deputy District Attorney John P. O'Mara in [*8]support of the CPL article 440 motion in the Ranta case, the witness recanted her statements implicating Ranta explaining that she lied to protect her then-boyfriend, who was also involved in the crime, to secure a better deal for him from the District Attorney.
Defense counsel also cited the case of Derrick Hamilton in support of his CPL 440.10 motion. Hamilton was convicted of murder "based upon the trial testimony of the victim's girlfriend, Jewel Smith" (People v Hamilton, 115 AD3d 12, 15). Smith later recanted her testimony and "claimed that she testified falsely against the defendant because the police threatened her with criminal prosecution and the removal of her children from her custody" (id. at 16).
In support of the instant motion, defense counsel attached a notarized letter from Smith dated September 7, 2007, to then-Governor Eliot Spitzer in which Smith detailed how she had been taken into custody and informed by Detective Scarcella that "if [she] wanted to leave the precinct and go home, [she] had to identify [Hamilton] as the person that committed the crime." When she complied, she was released, just as Detective Scarcella had promised.
In 2009 Hamilton moved pursuant to CPL 440.10 to vacate his conviction claiming, inter alia, that alibi evidence established his actual innocence after numerous witnesses came forward showing that he had been at a public function in Connecticut at the time of the murder (see People v Hamilton, 115 AD3d at 17-18). In support of his motion Hamilton argued that the evidence produced against him, including Smith's identification testimony, had been procured by fraudulent police practices (see id. at 12).
Hamilton's motion was denied by the Supreme Court (see id. at 19). However, this Court modified the Supreme Court's order and remitted the case to that court for a hearing (see id. at 29). Hamilton's conviction was subsequently vacated on January 9, 2015, by the Supreme Court, Kings County (Raymond Guzman, J.). The District Attorney's Office did not oppose Hamilton's motion to vacate his conviction.
The defendant's attorney argued that, in the wake of these and other revelations, the Kings County District Attorney had formed a "Conviction Integrity Unit" (hereinafter the CIU). Defense counsel alleged in his affirmation in support of the instant motion that the CIU had "opened investigations into approximately 50 homicide cases where Detective Scarcella and Detective Chmil directed the investigations that led to convictions." Defense counsel further alleged that the defendant's and the codefendant's case was "still under investigation."
Defense counsel argued that "the recent revelations concerning Detective Scarcella and his partner Steven Chmil . . . have called into question the very integrity of their work." The defendant's attorney concluded that the new evidence showing a pattern of improper identification procedures engaged in by Detective Scarcella and Detective Chmil "would have resulted in suppression of Crosson's identification of [the] defendant." Moreover, the new evidence "would have resulted in a different verdict had the defendant been able to introduce the evidence at his pre-trial hearing or at his trial."
b. Destruction of Evidence
In further support of the motion, defense counsel submitted the affidavit of Professor William E. Hellerstein, a former law professor who provided legal services to the codefendant between 2000 and 2002. Professor Hellerstein averred that 13 years ago, while investigating the matter, he was given access to the District Attorney's files and recalled seeing a document entitled "Prosecutor's Order Releasing the Exhibits." The professor averred that it struck him as odd at the time because the appeal was still pending. Based on the Hellerstein affidavit, defense counsel argued that these "revelations constitute[d] a showing of destruction of evidence conducted in bad faith on the part of the prosecution and the police department" warranting reversal of the conviction. Defense counsel also argued that the prosecution's actions violated the defendant's constitutional right to due process of law.
Defense counsel noted that, on the defendant's direct appeal, he had argued that the trial court had erred in denying his application for "an adverse inference charge for missing evidence since the blood samples had not been tested." The defendant had contended that if the blood had been compared to Neischer's blood and the test came back negative, the test would have supported the defendant's theory that one of the perpetrators had been shot by Neischer. Since neither the defendant nor the codefendant had been shot, such evidence would have been powerful evidence excluding them as the shooters.
Defense counsel argued that despite the importance of the blood samples to the issue raised by the defendant on his direct appeal, the apparent release of this evidence "during the pendency of . . . [the defendant's] appeal" indicated "that the evidence was destroyed as a result of bad faith."
Defense counsel asked the court to view this issue "in the context" of the pattern of police misconduct that had been documented in connection with this motion. Counsel further argued that the blood samples were particularly important in this case given that identification was the critical issue to be decided.
7. The People's Opposition
In opposition, the People argued that the defendant's CPL 440.10 motion to vacate the judgment of conviction should be summarily denied without a hearing.
The People acknowledged that "[p]ursuant to a decision by the Kings County District Attorney to review all cases in which Detective Scarcella was involved, which review was voluntarily undertaken prior to the filing of the defendant's motion, the instant case is one that is under review." The People nevertheless contended that "the allegations that Detective Scarcella may have been involved in misconduct in other cases are excessively remote and have no bearing on defendant's guilt."
Turning to the claim that the prosecution had intentionally destroyed blood evidence, the People argued that the case file still contained property vouchers for "two bicycles . . . a brown bag containing a shirt[,] blue jeans, white sneakers and boxer shorts[,] a tin can with a blood sample . . . and an item vouchered as five blood samples.'" The blood sample in the "tin can" had been "removed from [a] bicycle used in [the] shooting."
The People contended that there was no evidence that the blood evidence had been destroyed. The People argued that "[t]here would be no circumstance . . . where an assistant district attorney would authorize the release of vouchered blood samples."
8. The Defendant's Reply
In reply, defense counsel argued that the People appeared to be acknowledging that "the blood samples taken in connection with this case still exist." Defense counsel then requested that the blood evidence "be submitted for DNA testing pursuant to C.P.L. § 440.30(1-a)."
The defendant further noted that a sample of blood from Neischer still existed to "be used as a comparison." Counsel argued that "DNA testing" on the samples would lead to "two possible results: (1) the blood samples found in the car and on the bicycles were from Mr. Neischer as a result of the shooting; or (2) the blood samples come from one or both of the perpetrators."
9. The Supreme Court's Orders
In an order dated June 23, 2014, the Supreme Court, Kings County (ShawnDya L. Simpson, J.), granted the defendant's motion "only to the extent that a hearing [was] ordered." The court determined that "[c]ontrary to the People's contention, the defense has demonstrated that there may be new evidence concerning the reliability of the identification made by the one witness in this case."
In a subsequent order dated July 1, 2014, the Supreme Court, Kings County (ShawnDya L. Simpson, J.), directed the People to "provide the current physical location of the [*9]vouchered five blood samples' and tin can with a blood sample' and [to] make available to the Defendant said vouchered items for the purpose of forensic DNA testing" or, if the evidence no longer existed or if its location was unknown, to "provide a representation to that effect and information and documentary evidence . . . concerning the last known physical location of such specified evidence."
10. The People's Response
In a letter dated July 15, 2014, the People responded to the Supreme Court's production order. The People stated that in 1991, "storage numbers were assigned to evidence vouchers." Although the storage number associated with the voucher for the "tin can with blood sample" was located, the People had been "unable to obtain the storage number" associated with the "five blood samples."
The People stated that, in any event, they were "unable to locate records from 1991 or 1992 regarding the location where the above-referenced vouchered evidence was stored." An officer from the New York City Police Department Property Clerk's Office opined that "the evidence was most likely sent to the storage facility in Erie Basin, located at 700 Columbia Street in Brooklyn."
However, "th[e] evidence at Erie Basin was stored in thousands of barrels, designated and sorted by year, but the Erie Basin facility was severely damaged in Hurricane Sandy and . . . many barrels were destroyed and/or dislodged and are no longer in their previously designated positions." The People represented that the officer from the Property Clerk's Office "does not know if barrels containing evidence from 1991 still exist or where they might be located in that facility."
11. The CPL Article 440 Hearing
The Supreme Court, Kings County (ShawnDya L. Simpson, J.), held a CPL article 440 hearing from September 16, 2014, through October 14, 2014.
Robert Crosson was the first witness called to testify by the defendant. He testified that he had a "[g]ood" memory of the events surrounding the shooting.
He stated that he was sitting in the car with Neischer at about 4:00 a.m. It was a "workday." Neischer was dropping him off near his home and they had been parked at that location "for about ten minutes." They "were talking," and "weren't doing anything wrong."
Crosson testified that from the time the shooters approached to the time he got out of the car, "almost like a half-a-minute" passed. Crosson said that he and Neischer "didn't get out right away."
When he was asked whether he left the scene of the crime to get help, Crosson answered "No, I didn't leave . . . It is not like I ran away. [I was] just getting away from the car."
Crosson did not recall giving a description of the perpetrators to one of the responding officers. When he was presented with his trial testimony, Crosson still did not recall giving any description of the perpetrators.
Crosson stated that he was not interviewed by the Department of Correction regarding this case. Crosson testified that nobody from the Department of Correction came to the hospital to speak with him about what happened in the early morning hours of August 13, 1991. He said that a standard incident report was prepared.
When he was asked if he recalled "going into the 77th Precinct later on that morning," Crosson answered "I didn't go into the precinct that morning . . . I think it was a day or two later." Crosson stated that he met with "a couple of detectives" at the precinct, but that he did not remember their names.
On cross-examination, Crosson stated that he remembered identifying someone from a photograph. The person he identified was the defendant. Crosson testified that when he picked out the defendant's photograph, nobody told him whom to pick, nor forced him to pick out the [*10]defendant, and nobody gave him any information about the defendant.
Crosson stated that he went to view a lineup on August 14, 1991, and testified that he remembered picking the defendant out of the lineup. Crosson said that "no one told [him]" whom to pick, nobody forced him to pick the defendant, and nobody gave him any information about who was going to be in the lineup on that day.
Assistant District Attorney (hereinafter ADA) Edward Boyar, the individual who prosecuted this case in 1991, was also called by the defendant to testify. He testified that the case had been assigned to him "when there was apparently a backlog in the homicide bureau" and that he "did not write the case or present it to the grand jury but was assigned the case for trial only." He was told to "get rid of the backlog."
By letter from ADA Ed Purce sometime in 2002, ADA Boyar was made aware of two individuals who were considered suspects in this case based on a statement given by George Grant, an alleged witness to the crime. ADA Boyar interviewed Grant on March 6, 2002, and later concluded that his statement was "a boldfaced lie." ADA Boyar was also made aware of several other individuals who were also potential suspects in this case.
When he was asked if he looked into these potential new suspects before the CIU had been established, ADA Boyar answered: "This case had been reviewed by our office prior to that time by a very similar unit, whatever the name of it would be."
ADA Boyar acknowledged that officers and detectives had canvassed a number of hospitals on the date of the shooting looking to see if "[o]ne of the alleged perpetrators" had been injured. ADA Boyar explained: "It was a shoot-out. They wanted to see if the other guy might have gotten shot."
ADA Boyar testified that he did not know whether the blood samples were ever analyzed. The decision to prosecute the case "was not [his]." He could not ask Justice Goldstein for an adjournment to "see what had happened . . . [t]hat wasn't going to happen."
ADA Boyar testified that he thought that there was "some kind of plea offer" made to the codefendant by someone else "if he testified against the other fellow" which the codefendant refused. ADA Boyar indicated that he had inquired whether the defendant would be willing to plead guilty in exchange for a sentence of 5 to 15 years, but the defendant "wasn't interested in anything."
ADA Purce was the next witness called by the defendant to testify. He was assigned to review this case in connection with the CIU in July 2013. He was assigned to the case to look into whether the District Attorney's Office had prosecuted the right men for this murder.
ADA Purce recalled that blood evidence had been recovered at the scene including a sample from a bicycle that was used by one of the perpetrators. In connection with his review of this case pursuant to the CIU, ADA Purce sent "an E-mail and a letter to the forensic biology [sic] of the Office of the Chief Medical Examiner trying to find out what, if anything, happened to those particular swabs and if any testing was ever done." When asked if he ever received a response to his inquiry, ADA Purce testified: "I still have not received a definitive response about what's going on with that."
ADA Purce stated that blood samples found in the vehicle had also been vouchered. He reviewed a DD-5 form dated August 13, 1991, which indicated that this blood evidence would be processed further at the police laboratory. ADA Purce had "no independent knowledge" as to whether the blood analysis was done. When asked if the blood evidence was important to this case he answered: "If you had the blood, yeah, that would be helpful."
ADA Purce acknowledged that he wrote a letter to ADA Boyar in which he listed four potential suspects who were being investigated in connection with this case. The names of some of these individuals had been provided by Professor Hellerstein. Two of them had been shot and killed subsequent to this crime. The other two people were incarcerated at the time of the hearing. When [*11]asked if he ever tried to establish where these suspects were on the night of the shooting, ADA Purce answered: "I didn't get to that, no."
Detective Scarcella was the next witness called by the defendant to testify at the CPL article 440 hearing. The record reflects that his two attorneys stood next to him in the witness box during his testimony and made numerous objections and statements throughout the course of his testimony.
Detective Scarcella recalled the defendant's case "[t]o some extent." He testified that he had worked as a Brooklyn North Homicide Detective for 12 years. He investigated "more than fifty" homicide cases that led to convictions.
Since the defendant's conviction, Detective Scarcella had not discussed this case with anyone except his former partner Detective Chmil. They had discussed this case about "a dozen" times in the last two years.
Detective Scarcella repeatedly emphasized: "It was [Detective Chmil's] case. It was not my case." He testified that his involvement was "very limited" and that he did "nothing of substance." He later repeated that he did "[n]othing of substance" on the case.
When he was asked if he was with Detective Chmil when the defendant was arrested, Detective Scarcella stated "I don't remember." He also did not recall testifying at the suppression hearing before Justice Goldstein or being present when Crosson was presented with photographs.
When shown a DD-5 form that he had signed on August 13, 1991, in which he detailed the defendant's arrest, and asked if it refreshed his recollection, Detective Scarcella stated that it did not. He also did not recall testifying that they "got lucky" in choosing to go to the second floor. When asked if he obtained an arrest warrant before arresting the defendant, Detective Scarcella responded: "No, sir. I don't know your client. No, no, no, no, no, no, no, in Brooklyn," at which point his response was interrupted by defense counsel. The detective subsequently completed his answer stating he did not remember arresting the defendant, but the procedure in Brooklyn at that time was first to obtain authorization from the District Attorney's Office before making an arrest. The defendant's trial attorney later testified that as far as he remembered, the police had not obtained an arrest warrant prior to arresting the defendant.
Detective Scarcella testified that he was not aware that Detective Chmil referred to him as the assigned detective in this case. When asked if anything would refresh his recollection Detective Scarcella answered "not at all." When he was asked to confirm that there was nothing that would refresh his recollection Detective Scarcella answered: "It wasn't my case."
When he was confronted with the testimony from Detective Chmil indicating that he and Detective Barba were the assigned detectives, Detective Scarcella stated "I read it and it actually means nothing. I was not the case [d]etective." When he was asked whether he and Detective Chmil showed Crosson 6 photographs Detective Scarcella answered "I believe not. I have no recollection of that at all." When asked, after he reviewed the suppression hearing transcript, whether he and Detective Chmil pulled 6 photographs randomly out of a stack of 600 photographs, Detective Scarcella answered "I did not state that and I don't remember."
Detective Scarcella testified that he had last spoken with the District Attorney's Office in January or February 2012 in connection with the CIU review of the David Ranta conviction. Detective Chmil was his partner in the Ranta case. He acknowledged that, after he spoke with the District Attorney's Office, that office filed a motion to vacate Ranta's murder conviction and that one of the issues raised involved a lineup identification by Menachem Lieberman.
Detective Scarcella confirmed that the Kings County District Attorney's Office had continued the investigation into more than 50 prosecutions which involved his police work.
Detective Scarcella also testified that he was aware of individuals named Darryl [*12]Austin, Alvena Jennette, and Robert Hill, whose murder convictions had been overturned by the District Attorney's Office only a few months before the hearing. Detective Scarcella acknowledged that he had been the "lead detective" on the Hill case, and was a detective assigned to the other cases.
Detective Scarcella also acknowledged having used a witness named Theresa Gomez in all of those cases. He agreed that Gomez's testimony and his investigation were "a big part" of the three convictions that were vacated.
Detective Scarcella testified that about "five or six" homicide convictions were based on Gomez's eyewitness testimony. Detective Scarcella confirmed that he "locate[d]" Gomez and that she was "[his] witness." He acknowledged that she was addicted to crack cocaine and that he had given her money.
The People did not cross-examine Detective Scarcella.
The People only called one witness, Detective John Mullen, to testify at the hearing. He testified that sometime in 2014, he assisted ADA Purce in connection with the District Attorney's continued investigation into the defendant's case.
12. The Supreme Court's Order
In the order appealed from, the Supreme Court, Kings County (ShawnDya L. Simpson, J.), inter alia, granted that branch of the defendant's motion which was pursuant to CPL 440.10(1)(g) to vacate the judgment and for a new trial on the ground of newly discovered evidence (see People v Hargrove, 49 Misc 3d 1208[A], 2015 NY Slip Op 51517[U] [Sup Ct, Kings County]).
After summarizing the defendant's arguments on the motion, the court discussed its findings of fact (see People v Hargrove, 2015 NY Slip Op 51517[U], *6).
The court noted that "[i]n 2013, prosecutors reevaluated the case of David Ranta and sought his release from prison after evidence revealed that the testimony of identity witnesses in the case was false" (id.). "Similarly, Derrick Hamilton was convicted almost solely on the identification testimony of the girlfriend of the possible shooter who later recanted her story" (id.). "In other cases, Robert Hill, Alvena Jennette and Darryl Austin, were convicted almost solely by the identification testimony of an informant used by Detective Scarcella in various cases, who had a severe crack [cocaine] addiction and has since been discredited" (id.). "The judgment of conviction in those cases have also been vacated by the prosecution" (id.).
The Supreme Court stated that "[i]t has been established that the cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin" were compromised "by the intentional acts of Detective Scarcella" (id.). The court continued: "In each of those cases, Detective Scarcella procured identification testimony that was false" and "[a]ll the cases the District Attorney's office [has] vacated involved unreliable or false identification testimony facilitated by Detective Scarcella" (id.).
The court noted that "[t]he issue again in this case is the possible unreliability and compromised identification testimony of a witness prepared by Detective Scarcella" (id.). The defendant's conviction was "based solely on the identification of that one witness" (id.).
The court described the evidence that showed that Detective Scarcella participated in the various stages of the investigation which ultimately led to the defendant's identification. To begin, the court noted that Detective Scarcella's partner had testified at the suppression hearing that Detective Scarcella "was the Detective assigned to the defendant's case from the homicide squad" (id. at *7).
The court went on to note Detective Scarcella's testimony at the suppression hearing where he stated that he had responded to the apartment complex where the defendant lived at 12:30 a.m. after receiving an anonymous telephone call. Detective Scarcella claimed that the officers did not know where the defendant lived, but that they "got lucky" in spotting the defendant on the second floor of one of the buildings in the housing project (id.). Detective Scarcella did not have [*13]a warrant to arrest the defendant.
The court went on to find that the evidence showed that Detective Scarcella was present when Detective Chmil randomly selected photographs to be shown to Crosson at the police precinct. Detectives Chmil and Scarcella were the only two officers present when the photographic identification was conducted. The court further noted that the photographic identification was critical to the defendant's convictions.
Moreover, the court found that the record demonstrated that Detective Scarcella was present at, and participated in, the subsequent lineup identification procedure organized by him and his partner Detective Chmil (see id. at *8). The court concluded that Detective Scarcella was "in part responsible for the outcome" of the identification procedures "as the assigned Detective investigating and processing the case" (id.).
The court found that Detective Scarcella's testimony at the CPL article 440 hearing was "false, misleading, and non-cooperative" (id. at *6). The court reasoned that Detective Scarcella refused to confirm that he was the detective assigned to the case, repeatedly stating it was his partner's case and that "he did nothing of substance in the investigation" (id. at *3). These statements conflicted with other portions of Detective Scarcella's testimony where he consistently disclaimed any recollection of the most basic aspects of the investigation.
The court determined that "[t]he revelation of Detective Scarcella's malfeasance in fabricating false identification evidence gravely undermines the evidence that convicted the defendant in this case" (id. at *7). "The sole basis for the defendant's conviction [was] the identification by one witness" (id.).
In this regard, the court noted that Crosson had testified at the trial that the person who assaulted him was a stranger, and that "his assailants [were] two light skinned black males in their twenties" (id. at *6). The court observed that Crosson was a black male and that "[n]one of the defendants may be accurately described as light skinned' black males" (id.). The court further noted that the defendant was 17 years old at the time and the codefendant was 14 years old.
In addition, the court noted that Crosson "never recognized or identified that his assailant was a person known to him or that he had previously seen the defendant" (id. at *7). "There [was] no evidence Crosson recognized the defendant at the outset of the crime, although they lived in the same housing for over twenty years and [Crosson] admitted to knowing the defendant's family with whom the defendant lived" (id.).
The court reiterated that "[t]here was no other evidence available, aside from Mr. Crosson's testimony, to convict the defendant" (id.). The court then noted that the fingerprints that were taken from the bicycles used by the perpetrators and the fingerprints and palm prints that the police recovered from the stolen vehicle did not match either the defendant or the codefendant, and that in 23 plus years blood evidence that was recovered was not tested.
The court stated that the defendant's trial "appeared to be a summarily tried case, with missing evidence and a rushed process" (id. at *8). "Paperwork requesting DNA analysis was never completed" (id.). "It was also a two day, two defendant homicide jury trial" (id.).
The court also stated that "[r]ounds were fired . . . from the deceased and it is possible that the blood may be other than the victim's" (id.). The court further stated that the blood samples that were recovered by the police from the bicycles and the stolen vehicle were not made available at trial and cannot now be located. Accordingly, the loss of the blood samples that were recovered by the police from the bicycles and the stolen vehicle "brings into question the reliability and due process of the proceedings in this case" (id.).
The court concluded: "Given the false and misleading testimony provided by former detective Louis Scarcella at the hearing . . . and the circumstances surrounding the conviction, with missing biological evidence, inconsistent testimony, and bare evidence, this court finds that the [*14]newly discovered evidence makes it probable that the result in this case would have been different if a new trial were held" (id.).
The court stated that the issue here was "not whether the defendant is innocent, but whether the newly discovered evidence should require a new trial" (id.). The court determined that "[t]he pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth undermines our judicial system and gives cause for a new review of the evidence" (id.).
In light of its determination, the Supreme Court vacated the defendant's judgment of conviction and ordered a new trial.
Analysis 
The People have appealed the Supreme Court's order directing a new trial. The People raise two issues on this appeal.
Under their first point heading, the People argue that "[the] defendant failed to produce any evidence of alleged police misconduct that would have been admissible either at trial or at the pretrial suppression hearings, let alone admissible evidence that probably would have resulted in a different verdict" (emphasis in original).
In their second point heading, the People argue that the defendant failed to demonstrate that blood evidence was improperly destroyed. The People further argue that "there was no evidence that [the] defendant was deprived of the opportunity to seek testing of the blood evidence, either before, during, or after the trial."
1. The Newly Discovered Evidence Standard
The People contend that the Supreme Court erred in granting that branch of the defendant's motion which was for a new trial based on newly discovered evidence. The People argue that the evidence submitted by the defendant was insufficient to meet the standard for a new trial under CPL 440.10(1)(g). Accordingly, in order to evaluate the merit of the People's contention, we must first set forth the standard to be applied pursuant to CPL 440.10(1)(g).
This Court has applied a six-part test for determining whether newly discovered evidence may form the basis of a motion pursuant to CPL 440.10(1)(g):
"Newly-discovered evidence in order to be sufficient must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence" (People v Malik, 81 AD3d 981, 981-982 [internal quotation marks omitted]).
This Court has explained that "[the] power to grant an order for a new trial, based upon newly discovered evidence, is purely statutory and such power may be exercised by the court only when the requirements of the statute have been satisfied" (People v Balan, 107 AD2d 811, 815 [internal quotation marks omitted]; see People v Latella, 112 AD2d 321, 322).
However, the relevant statute only sets forth three of the six criteria that are routinely recited by this Court (see CPL 440.10[1][g]). Significantly, the requirement that the new evidence must "not be merely impeaching or contradicting the former evidence" (People v Davidson, 150 AD3d 1142, 1144 [internal quotation marks omitted]), does not appear anywhere in the statutory language (see CPL 440.10[1][g]).
To the contrary, the actual statutory language provides that:
"At any time after the entry of a judgment, the court in which it was [*15]entered may, upon motion of the defendant, vacate such judgment upon the ground that . . . [n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10[1][g]).
Accordingly, only the first three criteria listed above have any explicit basis in the statute (compare CPL 440.10[1][g], with People v Davidson, 150 AD3d at 1144). The remaining three criteria have been derived exclusively from case law.
The origin of the standard may be traced to Berry v State of Georgia (10 Ga 511), an 1851 case from the Georgia Supreme Court (see United States v Johnson, 327 US 106, 110 n 4; United States v Stofsky, 527 F2d 237, 243 [2d Cir]).
The defendant in that case—a white man named James Berry—was accused of conspiring with two African-American slaves to steal money from another man's house (see Berry v State of Georgia, 10 Ga 511). Much of the evidence used against Berry was obtained from one of the African-American slaves "in a confession drawn from him by whipping" (id. at 519). Among other "Common Law" principles relied upon in that case, was the rule that "a negro has never been permitted to give evidence in any case, where the rights of a white person were concerned" (id.).
After discussing these reprehensible sentiments, the Georgia Supreme Court considered the defendant's application for a new trial based on newly discovered evidence (see id. at 526-527). In rejecting the defendant's claim, the Georgia Supreme Court applied the six-part test (see id.).
After the precursor to CPL 440.10(1)(g) was enacted in 1881 (see Code of Criminal Procedure § 465[7], added L 1881, ch 442), the Court of Appeals ultimately grafted the common-law restrictions set forth in Berry v State of Georgia (10 Ga at 526-527) onto the statute, even though those six common-law criteria were not all specifically incorporated into the statute (see People v Priori, 164 NY 459, 472; see also People v Salemi, 309 NY 208, 226; see generally Brian R. Means, Postconviction Remedies § 3:3 [June 2017 update]).
Even after the current statute was enacted (see CPL 440.10[1][g], added L 1970, ch 996, § 1), courts have continued to apply these six common-law criteria, even though they were not all included in the statutory language (see People v Davidson, 150 AD3d at 1144; People v Mazyck, 118 AD3d 728, 730; People v Hamilton, 115 AD3d at 20; People v Deacon, 96 AD3d 965, 967; People v Malik, 81 AD3d at 981-982; People v Tankleff, 49 AD3d 160, 179).
However, in applying these common-law criteria, the courts have not consistently applied the "not [ ] merely impeaching" factor as a formal legal requirement that must be established before a court is permitted to grant a new trial based on newly discovered evidence. To the contrary, case law indicates that it is a factual or discretionary factor that is used for evaluating whether the new evidence would "create a probability" of a more favorable verdict (CPL 440.10[1][g]).
The Court of Appeals has consistently taken the view that a motion based on newly discovered evidence is a purely discretionary determination (see People v Jones, 24 NY3d 623, 627; People v Santos, 1 NY3d 548, 548; People v Baxley, 84 NY2d 208, 212; People v Brown, 56 NY2d 242, 246; People v Crimmins, 38 NY2d 407, 409; People v Patrick, 182 NY 131, 178; People v Buchanan, 145 NY 1, 30). This view undercuts the notion that the "not [ ] merely impeaching" criteria is a legal prerequisite. In addition, the actual application of this criteria in numerous cases indicates that newly discovered impeachment evidence may properly form the basis for a new trial [*16]under the current and former statutory schemes.
For instance, in People v Rensing (14 NY2d 210), the defendant was convicted of murder in the first degree based on the testimony of his codefendant and upon a confession obtained from the defendant (see id. at 211). Both the defendant and the codefendant were convicted, and the codefendant was subsequently "sent to [a] [h]ospital for observation" and later "found to be suffering from a longstanding mental illness'" (id. at 212). The codefendant "was certified as legally insane' and committed to [a] State Hospital" (id.).
The defendant thereafter moved for a new trial on the basis of this newly discovered evidence of the codefendant's mental health (see id.). The Supreme Court denied the motion, citing the defendant's confession, and concluded that the new evidence would not have materially affected the deliberations of the jury (see id.).
Since the defendant had been sentenced to death, the Court of Appeals performed a factual review of the Supreme Court's denial of the motion for a new trial (see People v Rensing, 14 NY2d 210). The Court of Appeals, with one Judge dissenting, reversed and ordered a new trial (see id.).
In reaching its conclusion, the majority stated that it was required to determine "the reactions of the jurors" if they had been aware of the new evidence regarding the codefendant's mental health (id. at 214). The majority reasoned that it was "impossible" to know how the new evidence of the codefendant's mental health would have affected the jury's determination (id.). The majority said "we would not have our verdict to affirm rest on possibility or surmise" (id.). Rather than remit the case to the Supreme Court for a hearing on the defendant's motion, however, the Court simply granted a new trial in the interest of justice (see id.).
Case law from the Appellate Divisions reinforces the view that impeachment evidence may properly form the basis for a new trial where it is of such weight that it would "create a probability" of a more favorable verdict (CPL 440.10[1][g]). For example, this Court has previously granted a new trial based solely on impeachment evidence (see People v Gurley, 197 AD2d 534, 536; People v Foller, 229 App Div 789, 789-790; see also People v Collins, 250 AD2d 379, 379-380; People v Barreras, 92 AD2d 871, 871; cf. People v Yoli, 150 AD2d 741, 741-742).
In addition, although this Court has often rejected new recantation testimony on the ground that it "merely impeached or contradicted . . . [the witness's] former testimony" (People v Cassels, 260 AD2d 392, 393; see People v Turner, 215 AD2d 703, 703; People v Baxley, 194 AD2d 681, 682, mod 84 NY2d 208; People v Legette, 153 AD2d 760, 761; People v Lavrick, 146 AD2d 648, 648; see also People v Saunders, 301 AD2d 869, 872), the Court of Appeals has specifically stated that "[e]vidence of recantation upon the part of a witness is not merely evidence which tends to impeach or discredit a witness" (People v Shilitano, 218 NY 161, 170; accord People v Jenkins, 84 AD3d 1403, 1408).
Similarly, the First Department has found that new evidence showing that police witnesses were guilty of various crimes unrelated to the defendant's case "would have merely impeached . . . [their] general credibility" (People v Quan Hong Ye, 92 AD3d 407; see People v Parsons, 6 AD3d 364, 365; People v Roberson, 276 AD2d 446; People v Tai, 273 AD2d 150, 151; People v Reyes, 255 AD2d 261, 263; People v Vasquez, 214 AD2d 93, 102; see also People v Major, 222 AD2d 284, 284).
However, in another case, the First Department affirmed an order granting a new trial based on new evidence which indicated that a Department of Correction captain had engaged in misconduct in unrelated cases (see People v Santos, 306 AD2d 197, 198, affd 1 NY3d 548). The First Department in that case held that the new impeachment evidence "went to the very heart of this defendant's trial defense" and created the probability of a more favorable verdict (id. at 198). Other cases from the Appellate Divisions have similarly indicated that impeachment material may properly [*17]form the basis for a new trial where the circumstances of the case showed that it would create a probability of a verdict more favorable to the defendant (see People v Madison, 106 AD3d 1490, 1493; People v Jackson, 29 AD3d 328, 329).
The disparate results in these cases are inconsistent with the view that the "not merely impeaching" criteria is a legal prerequisite. Rather, the divergent case law can only be reconciled if that criteria is construed to be a factor that should be taken into account when evaluating whether the new evidence would "create a probability" of a more favorable verdict (CPL 440.10[1][g]).
Indeed, it has been observed that any evidence that would warrant a new trial would almost necessarily tend to "impeach[ ]" or "contradict[ ]" the evidence presented by the People at trial (People v Salemi, 309 NY at 216; see Love v State of Maryland, 95 Md App 420, 433, 621 A2d 910, 917). Accordingly, a strict application of the "not [ ] merely impeaching or contradicting" criteria would subvert the overall purpose of the statute and render its remedial purpose illusory (People v Salemi, 309 NY at 216 [internal quotation marks omitted]; accord People v Santos, 306 AD2d at 198-199).
Accordingly, we conclude that the courts should only construe the core elements of the statute as strict legal requirements (see CPL 440.10[1][g]; accord People v Jones, 24 NY3d at 637 [Abdus-Salaam, J., concurring]). In other words, a motion for a new trial based on newly discovered evidence should only be granted if the court finds, as a factual matter, that the movant has demonstrated that "[1] [n]ew evidence has been discovered since the entry of a judgment . . . [2] which could not have been produced by the defendant at the trial even with due diligence on his part and [3] which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10[1][g]).
The remaining three criteria should be used to evaluate the ultimate issue of whether the new evidence would "create a probability" of a more favorable verdict (CPL 440.10[1][g]). In assessing the probable impact of the new evidence, the court should consider whether and to what extent the new evidence is (1) material to the pertinent issues in the case, (2) cumulative to evidence that was already presented to the jury, and (3) merely impeaching or contradicting the evidence presented at trial (accord People v Rensing, 14 NY2d at 214; People v Salemi, 309 NY at 215-216; People v Shilitano, 218 NY at 170).
Thus, in this case, this Court has reviewed the Supreme Court's factual determination that the newly discovered evidence would "create a probability" of a more favorable verdict (CPL 440.10[1][g]). To this end, we have evaluated the newly discovered evidence in light of the evidence adduced by the People at trial and the circumstances surrounding the trial as established by the record on appeal in order to determine what "the reactions of the jurors" would have been if they had been made aware of the new evidence that Detective Scarcella had engaged in a pattern of facilitating false identification testimony during the period in question (People v Rensing, 14 NY2d at 214; see People v Salemi, 309 NY at 227-228 [Fuld, J., dissenting]).
2. Application of the Standard
In the order appealed from, the Supreme Court properly considered the newly discovered evidence of prior police misconduct and evaluated its probable impact in the context of the defendant's trial. The court found that "[t]he sole basis for the defendant's conviction [was] the identification by one witness," and that "[t]he revelation of Detective Scarcella's malfeasance in fabricating false identification evidence gravely undermines the evidence that convicted the defendant in this case" (People v Hargrove, 2015 NY Slip Op 51517[U], *7).
The court then came to its ultimate factual determination: "Given the false and misleading testimony provided by former Detective Louis Scarcella at the hearing . . . and the circumstances surrounding the conviction, with missing biological evidence, inconsistent testimony, and bare evidence, this court finds that the newly discovered evidence makes it probable that the [*18]result in this case would have been different if a new trial were held" (id. at *8).
On their appeal, the People argue that Detective Scarcella's testimony was not important to the prosecution's case, and that the allegations of his misconduct in other cases would have had no effect on the outcome of the defendant's trial. This analysis fails to adequately contextualize the newly discovered evidence.
It is true that Detective Scarcella was not questioned about his role in the identification procedures at the original trial. However, this is merely a consequence of the fact that defense counsel did not have possession of the newly discovered evidence. If counsel had such evidence, there can be no doubt that Detective Scarcella's testimony would have figured more prominently in the defendant's case, which already was premised on misidentification. Accordingly, the impact of the new evidence cannot accurately be measured by simply negating the testimony that Detective Scarcella gave at the suppression hearing.
Furthermore, the People's entire case was premised on the identification testimony proffered by Crosson. Crosson's identification was facilitated by Detective Scarcella. He was one of the two detectives alone with Crosson during the initial photographic identification, and he was one of three detectives who supervised the subsequent lineup identification. Detective Scarcella, while not called at trial, was called by the People to testify at the suppression hearing before Justice Goldstein.
"[T]he People have the initial burden of going forward to establish the reasonableness of the police conduct and the lack of any undue suggestiveness in a pretrial identification procedure" (People v Chipp, 75 NY2d at 335; see People v Charles, 110 AD3d 1094, 1096). "Where the Judge at the suppression hearing determines that the testimony of the police officer is unworthy of belief, he [or she] should conclude that the People have not met their burden of coming forward with sufficient evidence and grant the motion to suppress" (People v Berrios, 28 NY2d 361, 369; see People v Martinez, 71 AD2d 905).
Accordingly, the defendant would not have been required to affirmatively demonstrate that Detective Scarcella engaged in improprieties during Crosson's pretrial identifications. If the Judge at the suppression hearing did not find the police testimony credible, suppression of Crosson's pretrial identification would have been warranted (see People v Berrios, 28 NY2d at 369; People v Martinez, 71 AD2d 905).
Moreover, there were reasons to question the police account of the identification procedures even before the evidence of Detective Scarcella's improprieties emerged. Crosson initially described the perpetrator as a light-skinned black male in his 20s. Detective Barba similarly testified that the description broadcast over the police communications system described a "[m]ale black, twenties . . . [l]ight complexion." The Supreme Court, after observing the defendant, concluded that he could not accurately be described as light-skinned. The defendant thus did not fit the primary distinguishing characteristic given by Crosson in his description.
And yet, less than 24 hours after the shooting, the defendant was taken into custody by Detective Scarcella. Indeed, police records indicate that the defendant's mother had been interviewed about 12 hours after the shooting occurred.
It should be recalled that the defendant was known to the police at the time—he had previously been arrested for a series of similar car-jackings which occurred in the vicinity of the Kingsborough Housing Project. The defendant later told the Department of Probation that "those who told Crosson to blame [him] and [the codefendant], knew about their car theft history."
Nevertheless, Detective Scarcella testified at the suppression hearing that he arrested the defendant after an individual at the 77th Precinct "received a phone call" from an anonymous source. Detective Scarcella testified that the unidentified caller did not specify where the defendant lived. When he was asked to provide further details given by the caller, Detective Scarcella stated [*19]that he "didn't answer the phone." When he was asked who took the anonymous telephone call, he answered: "I don't know."
When the detectives arrived at the housing project, they proceeded to the second floor of the building where the defendant's sister lived. The police, who did not have an arrest warrant, noted on the DD-5 form signed by Detective Scarcella that the defendant was arrested in the hallway in front of his sister's apartment. The defendant was given his Miranda warnings by Detective Scarcella in the bedroom of his sister's apartment (see Miranda v Arizona, 384 US 436). The defendant was informed that he was going to be charged with attempted murder. When he was asked how they knew to go to the second floor of that building, Detective Scarcella stated "[w]e got lucky."
The shooting had occurred at approximately 4:00 a.m. on August 13, 1991. Police records confirm that the defendant was arrested less than 24 hours later at 12:30 a.m. on August 14, 1991.
Crosson testified at trial that he went to the precinct and identified the defendant from a photograph on August 14, 1991. Accordingly, based on Crosson's testimony, the defendant was arrested before Crosson identified him.
At the suppression hearing, however, Detective Chmil testified that Crosson identified the defendant from a photograph at 11:30 a.m. on August 13, 1991—the same date as the shooting. This was a little more than seven hours after the shooting occurred.
Based on Detective Chmil's timeline, Crosson was shot in the hand, responded to the scene with police, was transported to the hospital with Neischer, underwent treatment for his wound, was interviewed by correction officers and police at the hospital, and then returned to the precinct later that morning to identify the defendant from a stack of looseleaf photographs. As noted, Crosson himself denied that this occurred both at the trial and at the CPL article 440 hearing.
Furthermore, if Crosson had identified the defendant prior to the arrest, it is unclear why Detective Scarcella did not mention this crucial fact during his testimony or in his DD-5 report. Instead, as noted, Detective Scarcella indicated that the defendant's arrest was precipitated by an anonymous telephone call which was recorded in his DD-5 report.
If, as Crosson's testimony indicates, the defendant was arrested before Crosson identified him, then the defendant's arrest was without probable cause (see generally People v Bigelow, 66 NY2d 417, 423-424). The illegal arrest could have formed an independent basis for suppressing the subsequent lineup identification as a fruit of the illegal arrest, thus making an intervening photographic identification critical (see generally People v Jones, 21 NY3d 449, 454-455).
Detective Chmil's testimony regarding the photographic identification is also problematic. Detective Chmil testified that he put together a series of six photographs to show Crosson. When he was asked how he chose the six photographs, Detective Chmil testified: "I just opened the drawer which contained about 5, 6 hundred color photos and just randomly picked out 6 photos." When Detective Chmil was asked whether he had any information indicating that the defendant was one of the perpetrators at the time that he selected the photographs, the court sustained the prosecutor's general objection to the question, without elaborating.
Detective Scarcella and Detective Chmil were alone with Crosson when the six separate photographs were shown to him. Although DD-5 reports were prepared for all of the other steps in the investigation, there is no DD-5 report in the record documenting the photographic identification.
If, as Crosson testified, the defendant was arrested prior to the photographic identification, the defendant would have been present at the precinct while the photographic identification was taking place. It is unclear why the police would have conducted a photographic identification even though the defendant was already in their custody.
Detective Chmil testified that he handed Crosson six color photographs in "looseleaf" form, and asked Crosson if he recognized anyone. Crosson picked out the photograph of the defendant.
Although Crosson repeatedly claimed at trial and during the CPL article 440 hearing that he did not know the defendant prior to this identification, the PSI report indicated that "Crosson identified [the defendant] as his shooter from the photos but admitted that he recognized him from the projects and would need to see him in person in order to be sure." At trial, Crosson testified that he only knew the defendant's mother and sister from the housing project.
In light of the foregoing, we conclude that evidence showing that Detective Scarcella had engaged in a pattern of falsifying evidence and facilitating false identification testimony would have had a powerful effect at the suppression hearing. The irregular circumstances and irreconcilable testimony surrounding the identification procedures would be difficult to ignore in the face of this new evidence.
If the suppression court refused to credit the police testimony about the events leading to Crosson's identification, the pretrial identifications would have been suppressed (see People v Berrios, 28 NY2d at 369; People v Martinez, 71 AD2d 905). Indeed, if the police were not credited, Crosson may very well have been precluded from even identifying the defendant at trial (see People v Marshall, 26 NY3d 495, 504; People v Rahming, 26 NY2d 411, 417; People v Underwood, 239 AD2d 366, 367). If Crosson's identification testimony was precluded, the impact would have been fatal to the prosecution's case as the People had no other evidence linking the defendant to this crime.
Given the powerful effect that the newly discovered evidence would have had at the suppression hearing and the ultimate effect on the outcome of the trial, the Supreme Court's conclusion that the newly discovered evidence would "create a probability" of a more favorable verdict is supported by the record (CPL 440.10[1][g]).
Even if the suppression court credited the police account of the defendant's arrest and Crosson's pretrial identification, the jury could have nevertheless found that the questionable police procedures surrounding Crosson's identifications created reasonable doubt as to the veracity and accuracy of his identification (see People v Ruffino, 110 AD2d 198, 202-203; see generally Gary Muldoon, Handling a Criminal Case in New York § 9:283 [September 2017 update]). What is more, the jury could have evaluated these unusual circumstances by taking into account, not only Detective Scarcella's history of facilitating false identification testimony, but the larger police investigation that occurred in this case.
For example the jury would have evaluated the police identification procedures in light of the curious handling of the blood evidence. The jury would have been aware that the police submitted the blood evidence that was obtained from the bicycles and the stolen vehicle to the laboratory for testing and comparison, but that they never received those results. There was no explanation as to why the blood was not tested.
In his summation, defense counsel asked the jury to "look at the way the police handled this case." He argued that important forensic evidence had not been tested or otherwise investigated. In this context, evidence showing that Detective Scarcella had engaged in a pattern of facilitating false identification testimony would have had an explosive effect. The irregular circumstances surrounding the identification would have reinforced the defendant's argument that the police had determined the defendant's guilt at the outset of their investigation, as reflected by their abbreviated forensic investigations. The evidence that Detective Scarcella had engaged in such practices in other cases would have been powerful support for the defense case and would have blunted the any response by the prosecution that the defense was peddling conspiracy theories.
Given this context, it is not difficult to imagine "the reactions of the jurors" if they [*20]had been made aware of the new evidence that Detective Scarcella had engaged in a pattern of facilitating false identification testimony during the period in question (People v Rensing, 14 NY2d at 214; see People v Salemi, 309 NY at 215-216). The new evidence would have provided a powerful new avenue to argue to the jury "that the pretrial procedure was itself so suggestive as to create a reasonable doubt regarding the accuracy of that identification and of any subsequent in-court identification" (People v Ruffino, 110 AD2d at 203). Accordingly, the effect of the new evidence at trial provides an additional ground for concluding that the newly discovered evidence would "create a probability" of a more favorable verdict (CPL 440.10[1][g]).
But in order to fully appreciate the likely effect of this new evidence at the trial, it should not be considered in a vacuum. Its full effect cannot be measured by simply considering the strength it would afford the defense case. Rather, the new evidence must be considered in the context of the relative strength of the People's evidence of guilt (see People v Rensing, 14 NY2d at 214; People v Salemi, 309 NY at 215-216).
Here, the People's case was exceptionally weak. The sole evidence of the defendant's guilt was Crosson's identification, which was obtained through the efforts of a police detective whose investigatory record is so troubling that the District Attorney has resolved to review every single one of his cases. The new evidence shows that this detective repeatedly procured false identification testimony during the same period that he worked to secure Crosson's identification of the defendant.
Furthermore, Crosson's identification of the defendant was inconsistent with the initial description that he gave to police investigators and inconsistent with the description that was broadcast over the police system. Crosson did not give an independent description of the perpetrators at trial.
Moreover, the forensic evidence that was actually tested in this case supports the defendant's claim that he is innocent. The record shows that the fingerprints and palm prints that were recovered from Neischer's vehicle were compared to the defendant's and the codefendant's prints, and the results were negative, meaning that they "didn't belong to the defendants." The fingerprints and palm prints also did not belong to Neischer, the owner of the car. Detective Barba testified that the fingerprints and palm prints were not compared to Crosson's prints because Detective Barba did not make a request for them.
More significantly, Detective Barba indicated that fingerprints were lifted from the two bicycles that were recovered from the scene of the crime. Detective Barba testified that "[t]he fingerprints that were lifted from the bicycles didn't belong to the defendants." These bicycles were left at the scene and secured by police minutes after the crime occurred. There was no testimony that the perpetrators wore gloves and the crime occurred in August.
The weakness of the People's case is manifested throughout the record and questionable aspects persist. The defendant and the codefendant were jointly prosecuted at a single trial where the initial jury instructions, the prosecutor's opening statement, the People's case, and the defense cases were all presented over the course of a single day. The jury delivered its verdict only after it was held until after 11:00 p.m. prior to the Thanksgiving holiday.
In the PSI report, it was noted that a correction officer stated that he received a telephone call from an inmate stating that the wrong people had been convicted for the crime. A correction officer who was "a friend and co-worker of the deceased" said that he "hope[d] that the defendants [were] the correct murderers."
After this Court affirmed the defendant's judgment of conviction, the District Attorney re-opened the defendant's case and began investigating at least four other suspects. This occurred before Detective Scarcella had been accused of any improprieties and before the CIU was even formed.
After revelations about Detective Scarcella surfaced in other cases, the CIU was formed, but the District Attorney's Office itself was unable to obtain the blood evidence for its own review. Detective Scarcella refused to cooperate with the review of the defendant's case, and the ADA in charge of the new investigation did not follow up with the other suspects who had previously been identified by the District Attorney's Office in its earlier review of the case.
When the defendant argued that the blood samples had been destroyed "in bad faith on the part of the prosecution and the police department" (emphasis omitted), the People argued that the case file still contained the property vouchers for the blood evidence, and indicated that it would not have been released under any circumstances.
The defendant thereafter asked the People to turn over the blood samples so they could be tested. The Supreme Court granted the defendant's request. However, the People then responded that the samples could not be located due to Hurricane Sandy. Incredibly, the People take the position on appeal that there is no evidence that the blood evidence no longer exists and that the defendant has never been precluded from testing it.
Finally, it should be emphasized that throughout this case the defendant has maintained his innocence. Neither the defendant nor the codefendant were interested in favorable plea deals that were floated by the prosecution before trial. Even after they were convicted both defendants independently maintained their innocence to the Department of Probation, and directly to the sentencing Judge at the sentencing proceeding, to their own considerable detriment. The defendant and the codefendant have continued to maintain their innocence to this day. The codefendant continued to challenge his conviction even after he was released from prison.
On their appeal, the People contend that the hearing testimony did not establish that any police misconduct occurred in this or in any other case, and that the evidence that was submitted with the defendant's motion papers would not be admissible at trial. The People's brief is focused on a list of factual statements made by the Supreme Court which, in the People's view, are not supported by the record.
The People's argument regarding the admissibility of the evidence that was submitted with the defendant's motion papers is unpreserved for appellate review. At the CPL article 440 hearing, the defendant's attorney specifically asked the court "to review all of the evidence that's been submitted . . . not only on the motion papers but [the defense's] supplemental papers" as well. The prosecutor did not object to the defendant's request. Accordingly, the People's current contention is unpreserved for appellate review (see People v Clarke, 81 NY2d 777, 778; People v Bartley, 298 AD2d 160, 160).
Furthermore, under the circumstances, this unpreserved issue should not be reached in the interest of justice. At the CPL article 440 hearing, the People themselves submitted documentary materials which they asked the court to consider as "[p]art of [the court's] record for review." Defense counsel had no objection to the People's request to have them considered in connection with the court's determination of the defendant's motion. Indeed, on this appeal, the People actually cite and rely on some of the submissions that the defendant attached to his CPL 440.10 motion papers.
By failing to raise these evidentiary objections before the motion court, the defendant was effectively deprived of any opportunity to respond to the People's objections by submitting additional, foundational proofs or alternative forms of evidence. Under the circumstances, it would be fundamentally unfair to reach these unpreserved evidentiary issues in the exercise of this Court's interest of justice jurisdiction (see People v Chatman, 14 AD3d 620, 620; People v Prescott, 191 AD2d 521; see also People v Hunter, 17 NY3d 725, 728; People v Lawrence, 64 NY2d 200, 206; Horton v Smith, 51 NY2d 798, 799; Pilon v Pilon, 278 AD2d 760, 760-761; Simon v Indursky, 211 AD2d 404, 405; see generally Prince, Richardson on Evidence § 1-201 [2008]).
As previously noted, the People also take issue with certain findings made by the Supreme Court. The People argue that "[t]he lower court's decision granting the motion to vacate the judgment rested largely on factual findings that are utterly unsupported by the record."
Specifically, the People contend that the record does not support the Supreme Court's statements that Detective Scarcella was " the assigned detective'" in this case, that he "prepared" Crosson and the photographic array, or that he "organized" the lineup identification. The People further contend that the record does not support the court's statement that Detective Scarcella testified at the pretrial hearing about " the identification procedures.'"
The People are correct that the particular phrasing used by the Supreme Court in characterizing Detective Scarcella's role in the investigation was, at times, overstated. However, the core of these factual findings was nevertheless supported by the record. The record amply demonstrates that Detective Scarcella was one of two detectives who participated in the photographic identification procedure, that he was one of the detectives who "supervised" the lineup identification, and that he testified at the hearing that was held regarding the identification procedures. Moreover, the People's argument that Detective Scarcella was not the assigned detective on the case is flatly contradicted by testimony from Detective Chmil, who stated that Detective Scarcella "was the assigned detective."
The relatively minor semantic deviations highlighted by the People do not invalidate the thrust of the Supreme Court's factual findings. Indeed, the Supreme Court's conclusion reflects its ultimate adherence to the record: that Detective Scarcella was "in part responsible for the outcome" of the identification procedures "as the assigned Detective investigating and processing the case" (People v Hargrove, 2015 NY Slip Op 51517[U], *8).
The People's semantic quibbling and their reliance on belated evidentiary objections only serve to distract from the critical inquiry in this case: whether the newly discovered evidence would "create a probability" of a more favorable verdict (CPL 440.10[1][g]). The relatively little space that is devoted to this issue in the People's appellate brief is notable.
The People's contention that the record does not establish that any police misconduct occurred in any other case is without merit. In support of his motion, the defendant provided evidence that Detective Scarcella had engaged in a pattern of falsifying evidence and facilitating false identification testimony during the same time period that he helped procure the identification testimony that was ultimately used to convict the defendant.
For instance, as previously noted, the defendant demonstrated that David Ranta had been wrongfully convicted of murder in 1991 based on an investigation by Detective Scarcella and Detective Chmil. That conviction was vacated in 2013, after the witness who identified Ranta at trial was contacted by the Kings County District Attorney's Office.
The defendant submitted an affidavit from the eyewitness in the Ranta case—Menachem Lieberman—who affirmed that before he entered the room to view the lineup, he was told to " pick the guy with the big nose.'" Lieberman did not identify Ranta "because [he] recognized him from [the scene of the shooting] . . . rather it was because he had the biggest nose of the lineup participants."
Lieberman went on to state that "[w]hen [he] later testified at trial, [he] was simply repeating [his] earlier identification from the lineup." Lieberman "did not recognize the individual in the courtroom, other than previously identifying him in the lineup." Lieberman explained that he made the false identification because "[he] had an inherent trust in police" and "[he] believed that they must have known something that [he] didn't."
Also, as previously noted, the defendant relied on the case of Derrick Hamilton. Hamilton was convicted of murder "based upon the trial testimony of the victim's girlfriend, Jewel Smith" (People v Hamilton, 115 AD3d at 15), who later recanted her testimony and at Hamilton's [*21]CPL article 440 hearing "claimed that she testified falsely against the defendant because the police threatened her with criminal prosecution and the removal of her children from her custody" (id. at 16).
In support of the defendant's motion, defense counsel attached the notarized letter from Smith. She had been arrested after the victim's body was found and transported against her will to the 79th Precinct. Smith later stated: "Once I was at the precinct, Detective Scarcella informed me that Derrick Bush' Hamilton shot [the victim]. And if I wanted to leave the precinct and go home, I had to identify [Hamilton] as the person that committed the crime."
Smith emphasized that "[t]he scenario was explained to [her] in detail by Detective Scarcella." Once Smith agreed to "follow[ ] his script" she "was released," just as Detective Scarcella had promised. It is uncontested that after numerous witnesses came forward showing that Hamilton had been at a public function in Connecticut at the time of the murder, his conviction was subsequently vacated.
We deem it also noteworthy to reiterate that, at the CPL 440.10 hearing, Detective Scarcella answered affirmatively when asked if he was aware that convictions involving Darryl Austin, Alvena Jennette, and Robert Hill had been overturned by the District Attorney's Office. He also acknowledged that he had been the "lead detective" on the Hill case and was a detective assigned to the other cases.
Detective Scarcella admitted that he used a witness named Theresa Gomez in connection with all three of those cases. Detective Scarcella acknowledged that Gomez's testimony and his own investigation were "a big part" of the three convictions that were vacated.
Detective Scarcella testified that about "five or six" homicide convictions were based on Gomez's eyewitness testimony. Detective Scarcella confirmed that he "locate[d]" Gomez and that she was "[his] witness." He acknowledged that she abused crack cocaine and that he had given her money.
Furthermore, at the hearing, Detective Scarcella confirmed that the Kings County District Attorney's Office had continued the investigation into more than 50 prosecutions which involved his police work. Notably, in their opposition papers, the People represented that the Kings County District Attorney had made a decision "to review all cases in which detective Scarcella was involved." In her closing remarks, the prosecutor acknowledged that "Detective Scarcella was found to have some kind of issue" in "the Ranta case, [and] the Robert Hill case."
On appeal, however, the People contend that the Supreme Court improperly took "judicial notice" of Detective Scarcella's malfeasance in the Ranta, Hamilton, Austin, Jennette, and Hill cases. However, the Supreme Court did not take judicial notice of these facts; the court found that they were established in the record. The evidence outlined above, and the inferences to be drawn therefrom, were more than sufficient to support the Supreme Court's conclusions.
The People's position on this point is not only without merit, it is disingenuous. For although the People are correct that a court should "not take judicial notice of a fact' which was controverted" (Weinberg v Hillbrae Bldrs., 58 AD2d 546), the People do not actually deny that Detective Scarcella's misconduct contributed to the vacatur of the five convictions listed above. In their extended discussion of the subject, the People do not once deny that Detective Scarcella committed misconduct in those cases or otherwise offer to explain why they consented to vacate those other convictions. Nor did the People attempt to counter the defendant's evidentiary showing with evidence to show that Detective Scarcella did not commit any misconduct in those prior cases.
The People additionally argue that the Supreme Court's "findings regarding Detective Scarcella's credibility [were] not supported by the record." This contention also lacks merit.
As this Court often states, "[t]he credibility determinations of a hearing court are entitled to great deference on appeal, and will not be disturbed unless clearly unsupported by the [*22]record" (People v Martinez, 58 AD3d 870, 870-871; see People v Britton, 49 AD3d 893, 894). The Court of Appeals has similarly recognized that "those who see and hear the witnesses can assess their credibility and reliability in a manner that is far superior to that of reviewing judges who must rely on the printed record" (People v Lane, 7 NY3d 888, 890).
In this case, the Supreme Court found that much of Detective Scarcella's testimony at the CPL article 440 hearing was "false, misleading and non-cooperative" (People v Hargrove, 2015 NY Slip Op 51517[U], *6). He testified that he only recalled the defendant's case "[t]o some extent."
Detective Scarcella's claim that his involvement in this investigation was limited and that he did nothing of substance was conclusively disproved by the record evidence. Detective Scarcella's repeated claim that it was not his case was contradicted by Detective Chmil's testimony at the suppression hearing that Detective Scarcella was the assigned detective. Detective Scarcella persisted in denying the extent of his involvement even when he was confronted at the hearing with evidence showing his participation.
Detective Scarcella's certainty regarding his lack of involvement in the case, even in the face of contradictory evidence, conflicted with his simultaneous claims that he could not remember anything about it. In fact, at times Detective Scarcella claimed within the same answer both that certain events did not happen and that he could not remember them at all. Furthermore, as the Supreme Court noted, his lack of any recollection about the case was at odds with his testimony that he had discussed the case with Detective Chmil about "a dozen" times over the last two years (id. at *7).
The Supreme Court's finding that Detective Scarcella was "non-cooperative" was also supported by the record (id. at *6). The transcript shows that his answers were evasive and non-responsive. In addition, Detective Scarcella stated that nothing would refresh his recollection about the case even before he was provided with the documents to review. ADA Purce indicated that Detective Scarcella had refused to assist with the CIU's investigation.
Although the Supreme Court, as the fact-finder, could have credited Detective Scarcella's repeated statements that he could not recall basic aspects of the defendant's case, it certainly was not required to do so (see e.g. People v Ianniello, 21 NY2d 418, 427). Indeed, the "false and evasive profession of an inability to recall, which amounts to no answer at all, is punishable as criminal contempt" (People v Ianniello, 36 NY2d 137, 142; see People v Schenkman, 46 NY2d 232, 237). Similarly, "a witness who swears falsely, willfully and corruptly to the effect that he [or she] does not remember certain material facts involved in the issue on trial, when in truth they are within his [or her] knowledge and recollection, is guilty of perjury" (People v Doody, 172 NY 165, 173).
As reviewed above, the record in this case supports the Supreme Court's finding that Detective Scarcella was not being truthful about his role in the investigation or about his memory of the case. The Supreme Court's credibility finding should be afforded deference as it had the opportunity to see and hear Detective Scarcella testify. Since the Supreme Court's credibility determination is supported by the record, we decline to disturb it (see People v Britton, 49 AD3d at 894; see also People v Martinez, 58 AD3d at 870-871).
This Court is vested with "a broad and discretionary power to be exercised in accordance with the conscience of the court and with due regard to the interests of the defendant and those of society" (People v Ramos, 33 AD2d 344, 348; see People v Kidd, 76 AD2d 665, 668). "Although [this Court's] ultimate concern should be the interests of justice in this particular case, [this Court's] responsibilities also include a duty to correct any situation which casts a doubt upon the proper functioning of the courts in the administration of justice" (People v Ramos, 33 AD2d at 348; see People v Kidd, 76 AD2d at 668).
Ultimately, in the context of this appeal, this Court must evaluate the Supreme Court's factual and discretionary determination to grant the defendant a new trial. Under the circumstances of this case and for the foregoing reasons, we conclude that the Supreme Court providently exercised its discretion in granting the defendant's motion for a new trial (see CPL 440.10[1][g]). Accordingly, the order is affirmed insofar as appealed from.
In reaching this determination, we nevertheless find it appropriate to stress that the vacatur of the defendant's judgment of conviction is specifically confined to the particular facts of this case, and the result here does not mandate any particular result in future cases involving Detective Scarcella. Each case must be reviewed on its own facts.
DILLON, J.P., DUFFY and LASALLE, JJ., concur.
ORDERED that the order is affirmed insofar as appealed from.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: Justice Goldstein was designated to the Appellate Division, Second Department in 1994.